[No. A031217. First Dist., Div. Four. Sept. 29, 1986.]

In re B. J. B., a Person Coming Under the Juvenile Court Law.
CONTRA COSTA COUNTY SOCIAL SERVICE DEPARTMENT,
Plaintiff and Respondent, v.
JOHNNY SIMON, Defendant and Appellant.

**[Opinion certified for partial publication.\*]**

---

*Certified for publication except as to part III. (Cal. Rules of Court, rules 976(b) and 976.1.)

**COUNSEL**

Craig R. Morey, under appointment by the Court of Appeal, for Defendant and Appellant.

Victor J. Westman, County Counsel, and Michael D. Farr, Deputy County Counsel, for Plaintiff and Respondent.

**OPINION**

**ANDERSON, P. J.**—Johnny Simon appeals from a judgment declaring B. J. B., his alleged natural son, free of his custody and control. Because the trial court expressly refused to make a finding that awarding custody to appellant would be detrimental to the child, we reverse.

FACTS

B. J. B. (B.) was born in October 1978 to Lorraine B. According to the birth certificate his father was Hubert B. (Hubert Sr.), then Lorraine's husband. Hubert Sr. has maintained at all times that he is B's natural father. However, appellant claims that he fathered the child while living with Lorraine. Lorraine has apparently made inconsistent statements about B's paternity.[1]

In January 1979 Lorraine moved into a home for battered women, along with B. and his older brother, Hubert (Hubert Jr.). About a month later she was asked to leave. She entered an alcohol detoxification center and placed the children in protective custody. A dependency petition was filed in Alameda County pursuant to Welfare and Institutions Code section 300, subdivision (a). After the case was transferred to Contra Costa County, both B. and Hubert Jr. were adjudged dependent and were placed in the home of Hubert Sr. In April 1980 a supplemental dependency petition was filed, alleging that Hubert Sr. had beaten Hubert Jr. and had beaten his girlfriend in the presence of the children. In June 1980 both boys were placed with Mr. and Mrs. S., in whose care they have remained.

In March 1984 respondent Social Services Department (Department) filed a petition pursuant to Civil Code section 232[2] to free B. from the custody and control of Lorraine and Hubert Sr. An amendment filed in May 1984 specifically named appellant as B.'s "alleged natural father" and sought a declaration freeing B. from appellant's custody and control. In May and June of 1984, B. was declared free of the custody and control of Hubert Sr. and Lorraine.[3] Similar orders were entered with respect to Hubert Jr.

Several continuances were ordered to permit appellant's appearance in the proceedings, to secure appointed counsel for him, and to allow the juvenile probation officer to prepare a supplemental report concerning appellant. The court then conducted a trial to determine whether appellant's asserted parental rights should be terminated. After taking evidence the

---

[1]That appellant is B's father was by no means conclusively established. No scientific or expert evidence was offered, and appellant's testimony concerning the dates on which he supposedly lived with Lorraine was internally inconsistent and (in one version) inconsistent with paternity. He did testify about an unusual anatomical feature he had in common with the child. In any event, the Department and the juvenile court seemed to assume for purposes of the proceedings below that appellant possessed the rights of a natural father, although he is described in the judgment as the "alleged natural father." Both parties on appeal continue to assume for argument that he is the natural father and we therefore do likewise.

[2]Unless otherwise indicated, all statutory references are to the Civil Code.

[3]Respondent advises that neither Lorraine nor Hubert Sr. has appealed from the orders affecting them.

court announced its intention to declare B. free of appellant's custody and control. Counsel for the Department submitted a proposed order and judgment. The proposed order contained several findings, including one that B. had been abandoned by appellant within the provisions of section 232, subdivision (a)(1). The court drew a line through a finding that "[r]eturn of said minor to his alleged natural father, Johnny Simon, would be detrimental to the child." The court initialled this deletion, and signed the order as thus modified.

ANALYSIS

I.

Appellant first contends that the judgment terminating his parental rights on grounds of abandonment cannot be sustained when the trial court expressly refuses to find that return to him would be detrimental to the children. Reluctantly, we must agree.

Two Supreme Court cases—*In re Carmaleta B.* (1978) 21 Cal.3d 482, 495 [146 Cal.Rptr. 623, 579 P.2d 514] and *In re Richard E.* (1978) 21 Cal.3d 349, 356 [146 Cal.Rptr. 604, 579 P.2d 495]—mandate a reversal of the judgment below based on the trial court's having struck the finding of detriment to the child. Those cases found the following language of section 4600, subdivision (c), applicable to section 232 proceedings: "Before the court makes any order awarding custody to a person or persons other than a parent, without consent of the parents, it shall make a finding that an award of custody to a parent would be detrimental to the child and the award to a nonparent is required to serve the best interests of the child." We have no choice but to invoke these precedents under the compulsion of *Auto Equity Sales, Inc.* v. *Superior Court* (1962) 57 Cal.2d 450, 455 [20 Cal.Rptr. 321, 369 P.2d 937]. However, we feel equally compelled to express our serious reservations with the legal analysis supporting this holding of the decisions in *Carmaleta B.* and *Richard E.*

Section 232 was added to the Civil Code in 1961 (Stats. 1961, ch. 1616, § 4, p. 3504) as part of an act which completely revised the Welfare and Institutions Code chapter relating to juvenile court law. (*Id.,* at pp. 3459-3504.) Section 232 begins a chapter entitled "*Freedom* from Parental Custody and Control" (italics added) and defines the actions available under the statute as "*termination* proceedings." (§ 232, subd. (b), italics added.) Section 4600 was added eight years later in 1969 (Stats. 1969, ch. 1608, § 8, p. 3330) as part of "The Family Law Act"—an extensive body of legislation covering marriage, the dissolution thereof, custody of children, support of children and the law of community property. (*Id.,* at pp. 3314-

3344.) Section 4600 set forth the order of preference for awards of custody (to either parent, followed by persons in whose home the child had become established, followed by any other suitable persons), then made it clear that any award to nonparents under the statute had to be supported by a finding that an award to a parent would be detrimental to the child.

There is concrete evidence that the Legislature never intended section 232 termination proceedings to be governed by the mandate of section 4600, subdivision (c). When section 4600 was added to the Civil Code in 1969, it contained essentially the same language as exists today. Four years later in 1973, section 232 was substantially changed, including the addition of subdivision (a)(7). (Stats. 1973, ch. 686, § 1, p. 1244.) Unlike any of the other circumstances, the finding of which supports a termination of parental rights under subdivisions (a)(1) through (a)(6), subdivision (a)(7) specifically required a determination "that return of the child to his parent or parents would be detrimental to the child . . . ." (*Id.*, at pp. 1242-1245.) Likewise, in 1984 the Legislature added subdivision (a)(8) providing for termination of the parental relationship for minors who have been declared dependent children of the juvenile court as a result of physical abuse. That enactment specifically requires a finding by the juvenile court "that attempts at reunification with his or her parent or parents would be detrimental . . . ."

Moreover, the Legislature has twice amended the language requiring a finding of detriment in subdivision (a)(7) since its enactment in 1973. It was originally required that this element be shown beyond a reasonable doubt. (Stats. 1973, ch. 686, § 1, p. 1244.) Later, the statute was changed to require a showing of detriment only by clear and convincing evidence. (Stats. 1976, ch. 940, § 2, p. 2153.) Most recently, the clear and convincing evidence language was removed. (Stats. 1983, ch. 309, § 2, p. 903.) Given this repeated legislative attention to the detriment requirement of section 232, subdivisions (a)(7) and (a)(8), it cannot be concluded that the Legislature had already, years before, intended the detriment language of section 4600 to govern all termination proceedings. For, if section 4600 applied to all termination subdivisions of section 232 when it was enacted in 1969, it likewise applied when section 232 was amended to add subdivision (a)(7) in 1973; it also applied in 1976 and also in 1983 when these subdivisions were amended; and it applied in 1984 when subdivision (a)(8) was added. And if it applied in 1969, then the Legislature was engaging in idle acts in 1973, 1976, 1983 and 1984.

Keeping in mind the presumption that the Legislature has in mind existing laws when it passes a statute (*Bailey* v. *Superior Court* (1977) 19 Cal.3d 970, 977, fn. 10 [140 Cal.Rptr. 669, 568 P.2d 394]) and that every word,

phrase and provision employed in the statute is intended to have meaning (*Johnson* v. *Santos* (1983) 148 Cal.App.3d 566, 573 [196 Cal.Rptr. 145]), it is clear that the Legislature would have had no reason to add this language to subdivisions (a)(7) or (a)(8) if it had intended section 4600 to control all actions under section 232.

The conclusion that the Legislature did not intend the detriment requirement of section 4600 to have any application to termination proceedings is further buttressed by an independent examination of section 232. Termination of parental rights may be adjudged on grounds of (1) child abandonment, (2) child neglect, (3) parent moral depravity, (4) parent conviction of felony, (5) parent mental illness, (6) parent mental disability, (7) child being in juvenile court ordered out-of-home placement for more than one year, and (8) child severely abused. Detriment is specifically mentioned only in the latter two situations. Applying the cardinal rule of statutory interpretation, *inclusio unius est exclusio alterius,* the only rational conclusion is that legislative inclusion of a detriment requirement for subdivisions (a)(7) and (a)(8) without such specific inclusion in subdivisions (a)(1) through (a)(6) is a legislative exclusion of such requirement for the latter notwithstanding the enactment of section 4600 elsewhere in the code.

Judicial inclusion by our Supreme Court of the detriment requirement in subdivisions (a)(2) (neglect) and (a)(6) (parent mental illness), *In re Carmaleta B., supra,* 21 Cal.3d 482, and in subdivision (a)(4) (parent conviction of felony) *In re Richard E., supra,* 21 Cal.3d 349, is supported by citation to *In re B.G.* (1974) 11 Cal.3d 679 [114 Cal.Rptr. 444, 523 P.2d 244] without even the slightest analysis of the question of legislative intent.

*In re B.G.* involved an action to declare minors to be dependent children of the court under former Welfare and Institutions Code section 600,[4] and while our Supreme Court therein was not called upon to consider whether section 4600 applied to section 232 cases it did state, "as we interpret section 4600, the court cannot take *custody* from a parent to place the child with a nonparent without a showing and finding that *parental custody* would be detrimental to the child." (*Supra,* 11 Cal.3d at p. 696, fn. 24, italics added.) It is not clear to us why this language was quoted as authority for imposing the section 4600 detriment requirement on what section 232 specifically labels *termination proceedings.* (*Id.,* subd. (b).) *In re Cynthia K.* (1977) 75 Cal.App.3d 81, 86 [141 Cal.Rptr. 875]—the only decision exclusively concerned with section 232, subdivision (a)(1), subsequent to *In re B.G.*—held that the trial court correctly terminated the parental rela-

---

[4]Now renumbered section 300.

tionship based solely on findings that the parent "had no real interest in her child and did in fact abandon the child."

Finally, it should be noted that since 1965 proceedings under section 232 have been governed by the mandate of section 232.5 that they "shall be liberally construed to serve and protect the interests and welfare of the child." (Stats. 1965, ch. 1064, § 1, p. 2710.) Recently, subsequent to the Supreme Court's decisions in *In re Carmaleta B., supra,* 21 Cal.3d at p. 482 and *In re Richard E., supra,* 21 Cal.3d 349, section 232.5 was amended to require that in deciding whether or not to terminate the parental relationship, the court should consider the wishes of the child. (Stats. 1983, ch. 309, § 3, p. 906.) Had the Legislature felt the formal requisites of section 4600 applicable to termination proceedings, it could have included the detriment requirement in section 232.5 at that time.

While complete analysis by the Supreme Court would have lightened our burden in examining whether or not the trial court erred in this case, we are compelled upon the basis of these precedents to find that terminating parental rights without a specific finding of detriment is error.

However, we have no doubt that the present record would support a finding of detriment. Together with his brother, B. has been living with Mr. and Mrs. S. since June of 1980. The brothers have thrived in this setting and have developed close relationships with their foster parents and with one another. Mr. and Mrs. S. plan to adopt both of them. By comparison, appellant has only seen B. once, some seven years ago, when B. was about four months old. As against the established stability of the S. home, appellant can only suggest that his seven brothers, two sisters, and mother would help him raise B. Furthermore, it appears that appellant's own history is one of transience and indigency, and the record before us does not inspire confidence in his material or psychological ability to perform parental duties. To award custody to appellant would deprive B. of the only parental relationship he has ever known, as well as a strong and healthy relationship with his brother, in favor of a probably unstable (and certainly alien) home environment. As in *In re Volkland* (1977) 74 Cal.App.3d 674, 680 [141 Cal.Rptr. 625], the evidence was sufficient to support a finding that "it would be detrimental to the child to uproot him from the environment and de facto parent he has known for almost seven years and to award custody to a parent with whom the minor has had very little contact . . . ."

The trial court's comments indicate that it may have been under a misapprehension as to what kind of showing was needed to support a finding

of detriment.[5] █ No showing of parental unfitness is required. (*In re B. G., supra,* 11 Cal.3d, at p. 698.) Several cases have sustained findings of detriment where a stable, positive, "de facto" parental relationship would be disrupted or destroyed by a change in custody. (*In re Justin G.* (1984) 151 Cal.App.3d 526, 528 [198 Cal.Rptr. 717]; *In re Volkland, supra,* 74 Cal.App.3d 674; see *In re Angelica M.* (1985) 170 Cal.App.3d 210 [216 Cal.Rptr. 18].) That such facts may constitute the requisite detriment is also apparent from *In re B.G., supra,* 11 Cal.3d 679. There, the mother was "expressly found fit to care for the children." (*Id.,* at p. 682.) However, although the Supreme Court held it error to award custody to foster parents without a finding of detriment under section 4600, it did *not* instruct the trial court to award custody to the mother. Instead the case was remanded for further findings, even though both parties asked the Supreme Court to enter a final custody order. (*Id.,* at p. 699.) It necessarily follows that the facts there, which were certainly no more indicative of parental "fault" than those here, were sufficient to support a finding of detriment.

█ In any event the judgment cannot be affirmed without a finding of detriment. The Department requests that we make this finding ourselves, or instruct the trial court to do so. This we must reluctantly decline to do in light of *In re B.G., supra.* As noted above, both parties there urged the Supreme Court to finally resolve the issue instead of remanding to the trial court. "Unfortunately," the court replied, "we cannot do so. The issue of custody is one committed to the discretion of the trial court. . . . Only in an exceptional case, in which the record so strongly supported a party's claim to custody that a denial of that claim by the trial court would constitute an abuse of discretion may an appellate court itself decide who should be granted custody. . . ." (11 Cal.3d, at p. 699.)

---

[5]The trial judge made the following comments in response to counsel's remarks concerning detriment to the child: "Counsel, don't you believe that . . . when they refer to it being detrimental to the child to return to the parent, they're referring to . . . more than the situation where the child has grown fond of the people in the foster home? . . . [I] can envision a situation where a parent who [through] absolutely no fault of his or her own find themselves in a situation where the child is in a foster care home for more than a year. . . . [¶] In that case, regardless of the merits of the parents, parental ability . . . you could argue that it would be detrimental to return that child to the home because the child was comfortable in the foster home. And I can't believe that is the Legislature's intent. [¶] It would seem to me that the legis[l]ative intent means something more than the fact that the child is comfortable in the foster home. [¶] MR. FARR: . . . In this case . . . I believe the evidence is much . . . stronger than mere comfort. It's a mother/child relationship, a father/child relationship. [¶] THE COURT: But that's my whole point. It just seems to me that you're often going to have that relationship when a child has been in a foster home for a year or more. . . . [¶] But seems to me when the Legislature was saying that it would be detrimental to return the child to the parent, they meant that for some reason it would be detrimental because of that parent's ability to parent and they didn't mean simply because the child has grown attached to the mother figure in the foster home. . . . [¶] I can't believe . . . the Legislature would be saying that you could terminate the parental rights of a parent who had done nothing wrong, on the face is a good parent."

It is true that the custody issue in *B.G.* was described as "closely balanced, with each alternative custody award presenting both advantages and disadvantages." (11 Cal.3d, at p. 699.) The present facts seem less closely balanced. However, reluctant as we are to remand this case for further proceedings, we are not prepared to hold on the record before us that the competing considerations so favor the Department that a finding in favor of appellant would be an abuse of discretion. Appellant testified that he could and would care for B. if custody were given to him, that he could provide a stable home, and that he would be assisted in this by his family. We are not free to weigh this evidence against the Department's, find it comparatively unpersuasive, and disregard it. Aside from certain criminal charges against appellant, there is nothing before us which could *compel* the conclusion that awarding custody to him would be detrimental to B. The Department does not argue that those charges, which are unsubstantiated on this record and upon which the trial court apparently did not rely, have any conclusive effect here.[6]

The Department cites general authorities dealing with the power of appellate courts to modify judgments. None of those authorities permit us to grant the relief the Department requests, because the evidence here is neither uncontradicted nor conceded by the parties; nor are the facts touching on the issue in question settled or otherwise conclusively established.

Our own research has discovered only two child custody cases in which an appellate court has supplied a finding of detriment. In *Guardianship of Marino* (1973) 30 Cal.App.3d 952, 960-961 [106 Cal.Rptr. 655], the court exercised its power to make findings under Code of Civil Procedure section 909, where formal findings had been expressly waived and the trial court's rulings and comments conclusively established that it had accepted evidence which necessarily established the requisite detriment. In *Chaffin* v. *Frye* (1975) 45 Cal.App.3d 39, 45, fn. 1 [119 Cal.Rptr. 22], the court said it was prepared to supply a finding where detriment was the only issue tried and it was evident that the trial court had applied the correct standard in its determination. In neither of those cases did the court supply a finding which the trial court expressly refused to make. In effect they merely gave expression to the trial courts' implied findings of detriment. Here we cannot suppose that the trial court impliedly found what it expressly refused to find.

---

[6]The record indicates that in 1982 appellant was charged with child molesting, and that at the time of the present hearing he was in jail awaiting trial on further charges of child molesting. Although appellant's brief states that he "is no longer in custody," the record reveals neither the specific nature nor the disposition of these charges. Obviously, if B. were going to be subjected to abuse in appellant's custody, that custody would be detrimental to him. This issue will not be foreclosed on remand. (See fn. 7, *post*.)

In *Blache* v. *Blache* (1945) 69 Cal.App.2d 616 [160 P.2d 136], the appellate court was asked to restore a finding of spousal neglect which had been stricken by the trial court. It concluded that it could not do so, because there was sufficient evidence that no such neglect occurred. (*Id.*, at p. 628.) Similarly, we cannot resurrect the deleted finding of detriment because this record does not permit us to hold that the trial court could not have accepted appellant's evidence and found in his favor.[7]

## II.

Appellant next contends that there was insufficient evidence to support the finding that he intended to abandon B.

To terminate parental rights on grounds of abandonment, the trial court must find intent to abandon "by clear and convincing evidence." (§ 232, subd. (c); *In re Jack H.* (1980) 106 Cal.App.3d 257, 264 [165 Cal.Rptr. 646].) However "[t]hat standard is for the guidance of the trial court only; on review, our function is limited to a determination whether substantial evidence exists to support the conclusions reached by the trial court in utilizing the appropriate standard." (*In re Heidi T.* (1978) 87 Cal.App.3d 864, 871 [151 Cal.Rptr. 263].) The trial court expressly applied the correct standard. We find substantial evidence to support its conclusion.

Aside from one occasion four months after B. was born (and some six years before trial), appellant never saw or communicated with B. The only support he ever provided was an unspecified sum of money he gave to Lorraine on that occasion. After that he never again saw or spoke with her. He claimed to have attempted to find her by visiting "her old house where she used to stay," by "asking around" about her whereabouts, and by following up on occasional leads, as by checking the buses she was seen riding on. He said that until he received the petition to declare B. free of his custody and control he was unaware that B. had been declared dependent and placed in a foster home. Had he known of B.'s whereabouts, he said, he would have contacted him and attempted to take part in his care and support. However, he never inquired of the Department where B. or Lorraine might be found, although he knew Lorraine had dealings with the Department and he himself dealt with the Department.

Appellant concedes the applicability of section 232, subdivision (a)(1), under which his failure to provide support and failure to communicate with

---

[7]On remand the trial court will not be limited to considering the evidence previously presented but may receive any evidence bearing on the issue of custody at the time of rehearing. (*In re Baby Girl M.* (1984) 37 Cal.3d 65, 76 [207 Cal.Rptr. 309, 688 P.2d 918].)

B. provided "presumptive evidence of the intent to abandon." However he contends that once he testified as to his lack of an intent to abandon, this presumption disappeared. (See *In re Rose G.* (1976) 57 Cal.App.3d 406, 424 [129 Cal.Rptr. 338].)

 Intent to abandon is a question of fact. (*In re Morrow* (1970) 9 Cal.App.3d 39, 47 [88 Cal.Rptr. 142], disapproved on other grounds in *Hollister Convalescent Hosp., Inc.* v. *Rico* (1975) 15 Cal.3d 660, 674 [125 Cal.Rptr. 757, 542 P.2d 1349]; *In re Gano* (1958) 160 Cal.App.2d 700, 705-706 [325 P.2d 485].) When the evidence permits the conclusion of only token efforts to communicate with the child, "Unless the presumption of abandonment raised by [that] fact has been overcome as a matter of law, the findings and order of the trial court under subdivision (a)[1] must be sustained." (*In re Morrow, supra,* at p. 52.)

 The trial court was not required to believe appellant's testimony as to his intent, nor does such testimony of itself overcome the presumption of abandonment as a matter of law. (See *In re Gano, supra,* 160 Cal.App.2d at p. 710.) Moreover, even were we to assume that appellant's testimony served to overcome the statutory presumption (see *In re Rose G., supra,* 57 Cal.App.3d 406, 424), the evidence nevertheless is sufficient to sustain the trial court's determination (*ibid.*).

 "Intent to abandon, as in other areas, may be found on the basis of an objective measurement of conduct, as opposed to stated desire." (*In re Rose G., supra,* 57 Cal.App.3d at p. 424.) In determining a parent's intent to abandon, the trial court may consider not only the number and frequency of his or her efforts to communicate with the child, but the genuineness of the effort under all the circumstances (*In re Jack H.* (1980) 106 Cal.App.3d 257, 265 [165 Cal.Rptr. 646]), as well as the quality of the communication that occurs (*In re Rose G., supra*).

 Assuming for purposes of argument only that the presumption afforded by subdivision (a)(1) is one affecting only the burden of production and that appellant's evidence was sufficient to make it "disappear," still the undisputed fact of six years' noncommunication and nonsupport did not lose its effect as ordinary evidence. The record contains more than ample evidence on which to predicate a finding of intent to abandon, especially since appellant and B. have lived in the same geographical area throughout the six-year period; appellant has acquaintances in common with the child's mother; and all of the affected persons have had substantial dealings with public agencies from which assistance in locating one another would presumably have been forthcoming if requested. Appellant's evidence fell far short of compelling a conclusion that it was impossible for him to locate

his child. The trial court was entitled to find that his efforts to do so were at best perfunctory, and it was not required to credit his protestations of continuing parental interest, particularly given the vagueness and inconsistency of his testimony.[8] The finding of abandonment is adequately supported.

## III.*

. . . . . . . . . . . . . . . . . . . . . . .

### DISPOSITION

The judgment is reversed and the cause remanded for further proceedings consistent with this opinion.

Appellant to recover costs on appeal.

Sabraw, J., concurred.

**POCHÉ, J.,** Concurring and Dissenting.—I concur in the reversal of this judgment but write separately to express my profound disagreement with the majority's analysis of issues which are unnecessary to the decision.

### 1.

### CIVIL CODE SECTION 4600.

In my view the majority's limiting interpretation of Civil Code section 4600 is insupportable not only because it runs contrary to unanimous authority,[1] but also because it denies effect to plain statutory language and to deeply engrained legal principles concerning the family.

---

[8]We note that although appellant testified that he looked for Lorraine at the home of her former foster mother, the record indicates that the initial emergency placement of B. was with this woman's son and daughter-in-law. It is difficult to perceive how diligent inquiries in that quarter could have failed to apprise appellant that B. had become a dependent of the court. Appellant's testimony that by the time he checked that "lead" no one lived there any longer suggests a substantial lapse of time and thus supports the inference of intent to abandon.

*See footnote, *ante,* page 1201.

[1]Before today, every court remarking upon the subject has considered a finding of detriment necessary to a judgment severing parental rights under Civil Code section 232. (*In re Carmaleta B.* (1978) 21 Cal.3d 482, 495-496 [146 Cal.Rptr. 623, 579 P.2d 514]; *In re Richard E.* (1978) 21 Cal.3d 349, 356-357 [146 Cal.Rptr. 604, 579 P.2d 495]; *In re David B.* (1979) 91 Cal.App.3d 184, 194 [154 Cal.Rptr. 63]; *In re James M.* (1976) 65 Cal.App.3d 254, 264-265 [135 Cal.Rptr. 222]; *In re Michele C.* (1976) 64 Cal.App.3d 818, 823 [135 Cal.Rptr. 17]; *In re Rose G.* (1976) 57 Cal.App.3d 406, 417 [129 Cal.Rptr. 338]; *In re D. L. C.* (1976) 54 Cal.App.3d 840, 849 [126 Cal.Rptr. 863]; *In re Susan M.* (1975) 53 Cal.App.3d 300, 314 [125 Cal.Rptr. 707]; *In re T. M. R.* (1974) 41 Cal.App.3d 694, 704 [116 Cal.Rptr. 292].)

Civil Code section 4600, subdivision (a), states in part: "In *any proceeding where there is at issue the custody of a minor child,* the court may, during the pendency of the proceeding or at any time thereafter, make such order for the custody of the child during minority as may seem necessary or proper." Subdivision (c) then sets out the following mandate: "Before the court makes *any order awarding custody to a person or persons other than a parent,* without the consent of the parents, it shall make a finding that an award of custody to a parent would be detrimental to the child and the award to a nonparent is required to serve the best interests of the child."

The majority, in observing that the Supreme Court held this provision applicable to Civil Code section 232 proceedings, concludes that it did so "without the slightest analysis of legislative intent." (*Ante,* at p. 1207.) So far as I can determine the Supreme Court was merely complying with the fundamental principles of statutory construction. "Where the 'statutory language is "clear and unambiguous there is no need for construction and courts should not indulge in it."' [Citations.]" (*In re Keith T.* (1984) 156 Cal.App.3d 983, 986 [203 Cal.Rptr. 112].) "If no ambiguity, uncertainty, or doubt about the meaning of a statute appears, the provision is to be applied according to its terms without further judicial construction." (*People v. Superior Court (Price)* (1984) 150 Cal.App.3d 486, 488 [198 Cal.Rptr. 61].)

The operative language of section 4600 is clear and unambiguous. By its terms it requires a finding of detriment, in "*any* proceeding where there is at issue the custody of a minor child," before the court can make "*any* order awarding custody to a person or persons other than a parent, without the consent of the parents." (§ 4600, subds. (a), (c).) On its face the statute has a universal application to *all* proceedings in which a natural parent asserts a right to custody as against a nonparent. It thus comes within the "cardinal rule that a court is not justified in ignoring the plain words of a statute unless it clearly appears that the language used is contrary to what, beyond question, was the intent of the Legislature [citation]." (*Breshears v. Indiana Lumbermens Mut. Ins. Co.* (1967) 256 Cal.App.2d 245, 250 [63 Cal.Rptr. 879] [rejecting a limiting construction of statute referring to "all fire policies"].)

Here the majority finds that a conflict exists between the all-inclusive language of section 4600 and a contrary, *exclusive* meaning it detects in Civil Code section 232. The exclusion results from the fact that two subdivisions of section 232 expressly require a finding of detriment while the

remaining six do not. Applying the maxim *expressio unius est exclusio alterius* ("to express one thing is to exclude another"), the majority finds that the six subdivisions *impliedly* exclude the requirement of a finding of detriment. Legislative history is then relied upon to support the conclusion that section 4600 was not intended to apply in section 232 proceedings.

A nearly identical statutory analysis relying on "nullification by implication" was convincingly rejected in *Williams* v. *Los Angeles Metropolitan Transit Authority* (1968) 68 Cal.2d 599 [68 Cal.Rptr. 297, 440 P.2d 497], in which the Supreme Court was called upon to determine whether the tolling provisions of Code of Civil Procedure section 352 applied to a minor's personal injury claim against a public entity. The entity noted that the Government Code specifically provided for the tolling of the claims period as to felons, and that it thereby "inferentially repealed the tolling provision for children." (*Id.* at p. 603.) Justice Tobriner wrote (*ibid.*): "The [district] first proposes to overcome the words of the code through a process of nullification by negative implication. For this purpose it invokes the maxim *expressio unius est exclusio alterius;* yet that rule of construction, whatever its force or value, does not apply here. It cannot perform its proper role of resolving an ambiguity in statutory language or uncertainty in legislative intent because here we encounter neither ambiguity nor uncertainty. The language of section 352 of the Code of Civil Procedure presents no question of meaning; when section 945.6 of the Government Code is read with it, no doubt or conflict arises as to minors. In these circumstances there is no room for the proposed rule of construction."

The problem here, as in *Williams,* is that no conflict or ambiguity exists until *after* the "expressio unius" motto is brought into play. There is no logical repugnancy on the face of the statutes. (Compare *People* v. *Memro* (1985) 38 Cal.3d 658, 701 [214 Cal.Rptr. 832, 700 P.2d 446] [impossible to comply with both laws at same time].) At most, the "detriment" language in Civil Code section 232 is *redundant* of section 4600. Even if that means the "detriment" language in section 232 is superfluous, the alternative—to construe section 4600 contrary to its plain meaning—runs afoul of a higher principle of statutory construction. (See *Palos Verdes Faculty Assn.* v. *Palos Verdes Peninsula Unified Sch. Dist.* (1978) 21 Cal.3d 650, 658-659 [147 Cal.Rptr. 359, 580 P.2d 1155].) If any Latin adage applies, it is not *expressio unius* but *superflua non nocent*—which unlike the former phrase is actually codified in our Maxims of Jurisprudence as "[s]uperfluity does not vitiate." (Civ. Code, § 3537.) The law recognizes that a drafter does not detract from a general principle merely by reiterating the principle in a specific context. Instances of redundant statutes are so numerous that

utter chaos would result if each such instance were seen as an implied conflict or limitation upon the scope of the affected provisions.

Even if an occasion were presented for studying the history of sections 232 and 4600, I find very little to support the majority's analysis. In fact I understand the history of those sections to support a contrary conclusion. Since the rendition of the decisions in *Carmeleta B.* and *Richard E.*, the Legislature has enacted at least 10 amendments to sections 232 and 4600 without expressing the slightest disagreement with or intention to alter the numerous holdings that a finding of detriment is required for an order terminating parental rights. (Stats. 1979, ch. 245, § 1, p. 532; Stats. 1982, ch. 978, § 1, p. 3525; Stats. 1983, ch. 309, § 2, p. 903; Stats. 1984, ch. 1246, § 1; Stats. 1984, ch. 1608, §§ 1, 9.5; Stats. 1985, ch. 528, § 1; Stats. 1979, ch. 204, § 1, p. 447; Stats. 1979, ch. 730, § 13, p. 2470; Stats. 1979, ch. 915, § 1, p. 3149; Stats. 1984, ch. 1679, § 1; see fn. 1, *ante.*) This silence supports continued adherence to those holdings. "'Statutes are to be interpreted by assuming that the Legislature was aware of the existing judicial decisions. [Citation.] Moreover, failure to make changes in a given statute in a particular respect when the subject is before the Legislature, and changes are made in other respects, is indicative of an intention to leave the law unchanged in that respect.'" (*Orr* v. *Superior Court* (1969) 71 Cal.2d 220, 226 [77 Cal.Rptr. 816, 454 P.2d 712], quoting *Alter* v. *Michael* (1966) 64 Cal.2d 480, 482-483 [50 Cal.Rptr. 553, 413 P.2d 153].)

If our role were that of a legislature we might discern compelling reasons for excluding a case like this one from the sweep of section 4600. The most obvious and compelling reasons which a finder of fact might find here include: (1) Appellant appears to be little more than, in Justice Mosk's words, a "casual inseminator" (*Michael U.* v. *Jamie B.* (1985) 39 Cal.3d 787, 797, conc. opn. [218 Cal.Rptr. 39, 705 P.2d 362]); (2) appellant voluntarily abandoned his child for a period of some six years; (3) *because of* that abandonment, appellant is a complete stranger to the child; (4) *because of* that abandonment the child has formed strong familial bonds to another home.

There is no need, however, to consider whether any of the foregoing factors might constitutionally permit a severance of parental rights, without a finding of detriment, under a rationale such as waiver, estoppel, laches, or the like. That question cannot arise unless and until the Legislature acts to limit the circumstances in which a finding of detriment is required. We do not sit in that branch of government.

## 2.

### SUFFICIENCY OF SHOWING.

I also decline to join in the majority's discussion of the sufficiency of this record to support a finding of detriment. There is no need to discuss that issue since no such finding was made by the trial court. Since the question has been raised, however, I reject the idea that the ordinary consequences of removing a child from a settled home can constitute, *by themselves,* the kind of "detriment" which justifies the forced termination of parental rights. The majority's analysis of this issue furnishes a rationale for unwarranted intrusion in all kinds of custody cases into the "private realm of family life which the state cannot enter." (*In re B.G., supra,* 11 Cal.3d at p. 694, fn. 23, quoting Traynor, J., concurring, in *Guardianship of Smith* (1954) 42 Cal.2d 91, 97 [265 P.2d 888, 37 A.L.R.2d 867].)

A parent's right to the care, custody, and management of a child is a fundamental liberty interest protected by the federal Constitution. (*Santosky* v. *Kramer* (1982) 455 U.S. 745, 753 [71 L.Ed.2d 599, 606, 102 S.Ct. 1388].) "The courts have long taken the position that the right[s] to conceive and raise one's children have been deemed essential, basic civil rights of man and rights far more precious than property. (*Stanley* v. *Illinois* (1972) 405 U.S. 645, 651 [31 L.Ed.2d 551, 558, 92 S.Ct. 1208, 1212].)" (*In re Jack H.* (1980) 106 Cal.App.3d 257, 263 [165 Cal.Rptr. 646].) In some respects, the acknowledgment of parental "rights" to the custody of children gives effect in the imperfect language of the law to a deeper social interest in the preservation and protection of the *family unit* as a whole. We should sanction intrusions into the presumptive inviolability of that unit only when compelling circumstances have been clearly demonstrated.

The majority opinion and some of the cases it cites may be read to support two equally intolerable rules for the termination of parental rights. One is that termination may be justified by the situational emotional upset which would result from removing the child from a "de facto" home. The other is that it is enough to show that the parents' home is relatively disadvantageous to the child's "best interests" when compared to an alternative placement.

Situational emotional disturbance is likely to occur whenever a child undergoes a change of environment. If this were a sufficient basis for termination of parental rights, the state could convert any temporary loss of custody into a permanent and irrevocable one. Such a rule would run afoul of the federal Constitution, for as the court observed in *Santosky* v. *Kramer, supra,* 455 U.S. at p. 753 [71 L.Ed.2d at p. 606] (italics added):

"The fundamental liberty interest of natural parents in the care, custody, and management of their child *does not evaporate simply because they have not been model parents or have lost temporary custody* of their child to the State."

Similarly, to permit the state to terminate custody *merely because it believes the parent's home is relatively disadvantageous* would give no more than lip service to the parents' fundamental rights. The requirement of a finding of detriment would be wholly meaningless under such a standard, and the "best interests of the child" would in reality be the *sole* criterion. Yet an undue emphasis on the "best interests of the child" indicates an unrealistic and imprudent belief in the omniscience and infallibility of the state. The courts have recognized that "a parent fit to exercise custody may have a better understanding of the best interests of his child than does the juvenile court." (*In re B.G., supra,* 11 Cal.3d at p. 694; see cases cited there.) Thus in *Roche* v. *Roche* (1944) 25 Cal.2d 141, 144 [152 P.2d 999], the California Supreme Court declared that parental rights could not be abridged simply because the home of a nonparent might appear better for the child (quoting *In re White* (1942) 54 Cal.App.2d 637, 640 [129 P.2d 706]): "'The right of a parent to the care and custody of a child cannot be taken away merely because the court may believe that some third person can give the child better care and greater protection.'"

The ease with which the state could sever familial bonds under the majority's analysis sends constitutional and other shivers down my spine. To its credit, the trial court explicitly recognized the Orwellian character of such a rule and just as explicitly rejected it: "Counsel, don't you believe that . . . when they refer to it being detrimental to the child to return to the parent, they're referring to . . . more than the situation where the child has grown fond of the people in the foster home? . . . I can envision a situation where a parent who [through] absolutely no fault of his or her own find themselves in a situation where a child is in a foster care home for more than a year . . . In that case, regardless of the merits of the parents, parental ability . . . you could argue that it would be detrimental to return that child to the home because the child was comfortable in the foster home. And I can't believe that is the Legislature's intent. [¶] It would seem to me that the legis[l]ative intent means something more than the fact that the child is comfortable in the foster home. [¶] MR. FARR: . . . In this case . . . I believe the evidence is much . . . stronger than mere comfort. It's a mother/child relationship, a father/child relationship. [¶] THE COURT: But that's my whole point. It just seems to me that you're often going to have that relationship when a child has been in a foster home for a year or more. . . . But [it] seems to me when the Legislature was saying that it would be detrimental to return the child to the parent, they meant that for some reason

it would be detrimental because of that parent's ability to parent and they didn't mean simply because the child has grown attached to the mother figure in the foster home. . . . I can't believe . . . the Legislature would be saying that you could terminate the parental rights of a parent who had done nothing wrong, on the face is a good parent."

Concededly, the former requirement that the parent be found "unfit" was replaced in 1969 with the current rule requiring a finding of detriment to the child. (*In re B.G., supra,* 11 Cal.3d at pp. 694-695.) Despite this change, however, I do not believe the fundamental point made by the court below and by the Supreme Court in *Roche* has changed. The Family Law Act, by which the change was accomplished, was not intended to disturb the practice of "awarding custody to nonparents in preference to parents only in *unusual* and *extreme* cases." (*Id.,* at p. 698, italics added.) And the elimination of "unfitness" as a sine qua non does not mean that it loses all relevance to the question whether the interests sought to be protected by the state are of such compelling nature as to warrant the irrevocable destruction of a family unit.

In my view, the "detriment" standard requires at least that the trial court expressly find that return to the parent's custody would result or be likely to result in (1) physical harm, including sexual abuse, or (2) serious emotional or mental harm. By "serious" harm I mean unusual or extraordinary psychological damage, not mere transitory or situational distress. Such detriment may be found without any finding of parental unfitness or fault; however, where the parent *is* materially and psychologically fit to care for the child a finding of detriment will rarely be justified. Most importantly, it is not sufficient that a return of the child to the parent's custody would result in the loss of some relatively advantageous features of an alternative placement.

Nor, in my opinion, can a finding of detriment rest solely on the fact that the child would be separated from a "de facto" parent. If the distress which would result from separation is not severe and lasting, it cannot justify the permanent termination of parental rights. On the other hand, the disruption of a strong "de facto" parent-child relationship may support a finding of detriment where the relationship has existed for an unusually long time, *and* where there is no basis for expecting the development of a comparable relationship with the parent—as where there has never been any intimate relationship between the child and the parent requesting custody, *and* where competent evidence is presented demonstrating that the severance of the de facto relationship would cause severe and lasting emotional harm to the child.

Whether the evidence presented below would justify finding these features is not a question we ought to address at this time.

For these reasons I concur in the judgment.